FULBRIGHT *v.* STATE.

Crim. 3886

Opinion delivered September 24, 1934.

*Cooper B. Land* and *William G. Bouic,* for appellant.

*Hal L. Norwood,* Attorney General, and *John H. Caldwell,* Assistant, for appellee.

JOHNSON, C. J. The grand jury of Jackson County indicted appellant for the crime of murder in the first degree for the killing of one W. P. Ford. Upon trial to a jury she was convicted of second degree murder and was sentenced to a term of five years in the State penitentiary, and this appeal is therefrom.

The only serious contention advanced by appellant for reversal is that the trial court erred in permitting witnesses to detail certain statements made by deceased immediately prior to his death because, as it is urged, not made by deceased while in the belief that death was imminent and impending. To understand the contention made, it is necessary to detail in brief the facts.

The deceased Ford and Will Parish met in the court house at Batesville in Independence County about 10 A. M. on September 7, 1933, and after some conversation went to inspect a small place purchased by deceased,

which was located about one mile from Batesville. They returned to Batesville about 1 o'clock P. M. the same day and went to the home of a Mrs. Mainard for refreshments. There appellant first appeared upon the scene. After imbibing freely of whiskey at Mrs. Mainard's home, deceased, Ford, appellant, Will Parish, Roy Hicks, Geneva Hicks, the wife of Roy Hicks, and Otis Crosser about 2 P. M. secured an automobile and went to a wooded section known in that community as Lover's Lane where the party again engaged in drinking. After all the whiskey was exhausted, the party concluded to go to Newport in Jackson County, and upon their way there additional whiskey was obtained and the party arrived at Newport about sundown the same day, all in a more or less intoxicated condition. At this point the evidence of witnesses is in irreconcilable conflict, but that upon behalf of the State tended to establish that at the bridge at Newport three other people joined the party and after riding over Newport for some little time the party as augmented went to a secluded spot adjacent to Newport where deceased was slugged and robbed of $58. This occurred about 8 o'clock P. M., September 7, 1933. A witness on behalf of the State, a Mr. Ward, testified that about 5:30 or 6 o'clock A. M., September 8, 1933, his attention was attracted by the cries of deceased Ford; that deceased requested witness to assist him, and he did so by calling Mr. William and Mr. Albright; that deceased was in a bad condition—his head was caved in on the right side. Deceased told witness that "he did not aim to be here much longer," and showed witness a rock upon which deceased had carved his name for identification. Deceased told witness that he "had done give up," and for that reason had carved his name upon the rock. Deceased died in about thirty minutes after this conversation. Deceased told witness that he, a Mr. Parish, and another fellow, Essie Fulbright, and another woman named Mabel were out drinking together; that Parish started to the car and deceased attempted to follow Parish at which time he was struck on the head. Deceased mentioned no other person being present at the scene. This occurred in Jackson County.

Sheriff Albright testified that he examined deceased before he died and found a large hole in the right side of deceased's head; that deceased told witness he didn't know who struck and robbed him, but that Will Parish, Essie and Mabel were with him when he was struck and robbed. Deceased told witness: ''I have been laying here all night, and it looked like I wasn't going to get any help, and I was afraid of what might happen to me, and I wrote this on the rock to identify myself.''

After appellant, Hicks and wife, and Crosser left deceased at the place where he was found, the following morning they returned to Batesville arriving there about 10 p. m., and immediately thereafter left Batesville for points in Missouri and Oklahoma. They were apprehended near Springfield, Missouri, some three days after Ford's death, and all made conflicting statements in reference to their locations, whereabouts and travels not only after Ford's injury but prior thereto.

From the facts and circumstances here detailed, it was certainly a question of fact for the jury's determination whether or not deceased believed that death was impending at the time he made the declarations to witnesses Ward and Albright.

The fact that deceased had carved his name upon a stone for identification purposes was patent evidence that he believed the end was near; the fact that the right side of his head was crushed must have demonstrated to him the seriousness of his condition; the fact that deceased told witness Ward that ''he had done give up'' was tantamount to saying that death was inevitable. At any rate the facts and circumstances were amply sufficient to warrant the trial court in submitting the matter to the jury.

True, it is the settled law in this State that declarations of a deceased person made when hope of recovery was not relinquished are not admissible as dying declarations, but, when all the facts and circumstances surrounding such declarations unerringly indicate that hope of recovery is relinquished, then such declarations are admissible as dying declarations. Underhill on Criminal Evidence, § 172. Greenleaf on Evidence, (16 ed.) § 158;

640

*Sanderlin* v. *State,* 176 Ark. 217, 2 S. W. (2d) 11; *Alford* v. *State,* 161 Ark. 256, 255 S. W. 884; *Evans* v. *State,* 58 Ark. 47, 22 S. W. 1026; *Scroggins* v. *State,* 109 Ark. 510, 159 S. W. 211.

*Weakley* v. *State,* 168 Ark. 1087, 273 S. W. 374, in no wise conflicts with the views here expressed. There the wound was in the leg, and no fact or circumstance was offered in evidence showing or tending to show that deceased Garrison had relinquished hope of recovery at the time the declarations were made.

Other cases are cited in brief, but the discussion heretofore set out fully disposes of the contentions urged.

We have explored the transcript to ascertain the correctness of the instructions requested, granted and refused, and have concluded that no prejudicial error was committed in this regard.

No prejudicial error appearing, the judgment is affirmed.